UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

American Alliance for Equal Rights,
Richard Fisher, & Phillip Aronoff,

      Plaintiffs,

v.

City of Chicago,
Bally's Chicago, Inc.,
Bally's Chicago Operating Company, LLC,
& Sean Brannon, Stephan Ferrara,
Dionne Hayden, & Charles Schmadeke, in their
official capacity as Members of the Illinois Gaming
Board,

      Defendants.

## COMPLAINT

Plaintiffs state their Complaint against Defendants as follows:

### INTRODUCTION

1.    The City of Chicago will soon have a new casino: Bally's Chicago. To be built on a 30-acre site, the development will include a 3,000-seat theater, six restaurants, a food hall, approximately 3,000 slot machines, 173 table games, and VIP gaming areas. It will also have a 500-room hotel tower with a large pool spa, fitness center, sun deck, and rooftop restaurant (collectively, the "Casino"). The development cost will likely be more than $1.7 billion.

2.      Bally's Chicago, Inc., a new corporate entity, has advertised an initial public offering to raise $250 million. Through this "Class A Interests" offering, Bally's Chicago, Inc. (and its investors) will own 25% of the Casino.

3.      Chicago leaders have touted this offering as a fantastic chance to "create generational wealth."[1] At an information session, Alderwoman Ronnie Mosley (21st Ward) said, "[t]onight is about a new opportunity on how to participate, about not just being a consumer but to be an owner." One resident of the Auburn Gresham neighborhood called the offering a "no-brainer."

4.      Yet this offering is not open to everyone. This investment opportunity is only for "people of color" and "women." White males are ineligible. Moreover, initial investors cannot even resell their shares to white males.

5.      Plaintiffs are the American Alliance for Equal Rights and two individuals who cannot invest because they are white males. They would like to be dealt in on this offering but are excluded from the table solely based on immutable characteristics. In short, Defendants have stacked the deck against them, a hand Defendants cannot play.

---

[1] Corli Jay, *Chicago's Black Residents Can Invest in Bally's Casino*, Tribe (Jan. 17, 2025), available at this link: https://thetriibe.com/2025/01/chicagos-black-residents-can-invest-in-ballys-casino/.

6.     This race-based stock offering is illegal, and this Court should declare it as such. Defendants' scheme to prevent investment based on race violates federal civil rights statutes. Defendants are, therefore, liable to Plaintiffs for damages, including punitive damages, and an order of specific performance or rescission. This Court should further declare Defendants' offering illegal, enter an injunction permitting resale of Class A Interests to anyone regardless of race, and enjoin future enforcement of Illinois's discriminatory law.

## PARTIES

7.     The Alliance is a nationwide membership organization dedicated to ending racial and ethnic preferences across the United States. The Alliance was founded in 2021. That same year, the IRS approved the Alliance as a 501(c)(3) tax-exempt organization. Since then, the Alliance has continuously grown. It currently has more than 250 members. The Alliance's members are actively involved in the organization and its affairs. Members voluntarily join the Alliance. They pay dues. They receive updates. They also offer input on the Alliance's litigation and other activities.

8. Pursuant to the Alliance's mission, it frequently and successfully litigates high-profile civil rights cases. *E.g.*, *Am. All. for Equal Rights v. Fearless Fund Mgmt., LLC*, 103 F.4th 765 (11th Cir. 2024); *Am. All. for Equal Rights v. Founders First Cmty. Dev. Corp.*, No. 4:24-cv-00327-O, 2024 WL 3625684 (N.D. Tex. July 31, 2024).

9. The Alliance has at least two members who are interested in and able, ready, and willing to purchase Class A Interests but are prohibited from doing so because they are white males.

10. Plaintiffs Fisher and Aronoff are interested in and able, ready, and willing to invest in Bally's Chicago, Inc., but they cannot because of their race.

11. Richard Fisher is a white male who resides in Richmond, Texas.[2] He is retired and invests regularly. He tried to purchase Class A Interests but could not because he is a white male. He is a citizen of the United States and an Alliance member.

12. Phillip Aronoff is a white male who resides in Houston, Texas. He is retired and invests regularly. He is a citizen of the United States and an Alliance member.

13. The City of Chicago is a municipal corporation in Illinois, with a principal place of business at 121 N. LaSalle Street, Chicago, IL 60602.

---

[2] The investment opportunity is open to residents of four states, including Texas. Specifically, it is open to Illinois, Florida, New York, and Texas residents.

14.     Bally's Chicago, Inc. is a Delaware corporation and an indirect subsidiary of Bally's Corporation.

15.     Bally's Chicago Operating Company, LLC ("Bally's Chicago OpCo") is a Delaware limited liability company and a wholly owned subsidiary of Bally's Chicago, with a principal place of business at 100 Westminster Street, Providence, RI 02903.

16.     Sean Brannon, Stephan Ferrara, Dionne Hayden, and Charles Schmadeke are Illinois Gaming Board members ("Illinois Gaming Board Members"). They are responsible for implementing the Illinois Gambling Act, including 230 ILCS 10/6(a-5)(9), discussed below.

17.     The Illinois Gaming Board Members are sued only in their official capacity for declaratory and injunctive relief.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over this action under 28 U.S.C. § 1331 because this case arises under the Constitution and the laws of the United States.

19.     Venue is proper under 28 U.S.C. § 1391 because the City resides in this District, and a substantial part of the events occurred in this District.

## STATEMENT OF FACTS

20.     In the summer of 2019, the Illinois Governor signed Public Act 101-0031, which significantly expanded legal gambling throughout Illinois, amending the Illinois Gambling Act, 230 ILCS 10/1 *et seq.* (the "Act").

21.     The Act authorized the City to issue a single casino owner's license, and it also delegated substantial regulatory power to the City. For example, the City can determine the casino's location.

22.     Under Section 7(e-5) of the Act, before the Illinois Gaming Board considers an application for an owner's license, the applicant must negotiate in good faith with the City and meet various statutory requirements.

23.     Importantly, under the Act, an application for an owner's license must contain "evidence the applicant used its best efforts to reach a goal of 25% ownership representation by minority persons and 5% ownership representation by women." 230 ILCS 10/6(a-5)(9).

24.     On June 9, 2022, the City entered into a Host Community Agreement with Bally's Chicago OpCo (the "Agreement"), the project "Developer." Under the Agreement, Bally's Chicago OpCo will design, develop, construct, and operate the Casino.[3]

25.     On behalf of the City, then-Mayor Lori E. Lightfoot and City Clerk Andrea M. Valencia signed the Agreement. President George Papanier signed on behalf of Bally's Chicago OpCo.

---

[3] The Agreement is available on Chicago's website: https://www.chicago.gov/content/dam/city/sites/chicago-casino/pdfs/Ballys-June-9-2022-HCA-Fully-Executed-with-Exhibits.pdf.

26.     In compliance with the Act, the Agreement specifies that Bally's Chicago OpCo committed that minorities will own 25% of the Casino. "Minority" means an African American, Asian American, American Indian, Hispanic, or woman (regardless of a woman's race). Page 115 of the Agreement (Exhibit A-9, Minority and Women Ownership Provisions) spells out these terms.

27.     On December 30, 2024, Bally's Chicago, Inc., announced the commencement of an initial public offering of a 25% equity stake in the Casino.[4]  The announcement explains that "monies raised are intended to support the funding for Bally's planned permanent casino." The announcement also states that the initial public offering is only for "Qualified Investors under the terms of the Host Community Agreement."

28.     That same day, Bally's Chicago, Inc.'s President Ameet Patel distributed an email explaining the investment opportunity.[5]  The email informs Bally customers of an "initial public offering and concurrent private placement of securities representing a 25% equity interest in the casino project at River North."

---

[4] This announcement is available on Bally's website: https://www.ballys.com/news/news-details/2024/Ballys-Chicago-Announces-Investment-Opportunity-2024-oGVtw87vwp/default.aspx.

[5] This email is available on the SEC.gov website: https://www.sec.gov/Archives/edgar/data/1935799/000110465924132570/tm231097 1-18_fwp.htm#tAPA (Appendix A link).

29.     In the email, President Patel explained that this investment opportunity is a "set aside for investors that meet the Qualified Investor Criteria." Continuing, he said: "In general, adults who are women or people of color are eligible and fit the City of Chicago criteria."

30.     Also on December 30, 2024, Bally's Chicago, Inc. filed a registration statement (Form S-1) with the United States Securities and Exchange Commission.[6] It provides more details. In this statement, Bally's Chicago, Inc. reported that it intends to sell Class A Interests. Bally's Chicago, Inc. explained that following the closing, it would become a holding company with its principal assets consisting of its interests in Bally's Chicago OpCo. Bally's Chicago, Inc. will use the net proceeds from the offering to purchase an aggregate 25% economic interest in Bally's Chicago OpCo. In other words, Bally's Chicago, Inc. is a holding company that will own 25% of the Casino. The remaining 75% of the economic interests of the Casino will be owned by Bally's Chicago Holding Company, LLC ("Bally's Chicago HoldCo"). Bally's Chicago HoldCo will also own 100% of the Class B interests in Bally Chicago, Inc., with 75% of the voting power and no economic interest in that corporation.

_____

[6] An amended version of this form is available on the SEC.gov website: https://www.sec.gov/Archives/edgar/data/1935799/000110465924132193/tm231097 1-13_s1a.htm.

31.     The Bally's Chicago, Inc.'s registration statement explains that the "offering is only being made to individuals and entities that satisfy the Class A qualification Criteria." According to the statement, if the investor is an individual, he or she must be a minority or woman. If an entity, it must be controlled by minorities or women.

32.     The registration statement defines the term "minority" with reference to the Municipal Code of Chicago 2-92-670(n) as follows:

any individual in the following racial or ethnic groups:

- African-Americans or Blacks (including persons having origins in any of the Black racial groups of Africa);

- American Indians (including persons having origins in any of the original peoples of North and South America (including Central America) and who maintain tribal affiliation or community attachment);

- Asian-Americans (including persons whose origins are in any of the original peoples of the Far East, Southeast Asia, the islands of the Pacific or the Northern Marianas or the Indian Subcontinent);

- Hispanics (including persons of Spanish culture with origins in Mexico, South or Central America or the Caribbean Islands, regardless of race); and

- individual members of other groups, including but not limited to Arab-Americans, found by the City of Chicago to be socially disadvantaged by having suffered racial or ethnic prejudice or cultural bias within American society, without regard to individual qualities, resulting in decreased opportunities to compete in Chicago area markets or to do business with the City of Chicago. Qualification under this clause is determined on a case-by-case basis and there is no exhaustive or definitive list of groups or individuals that the City of Chicago has determined to qualify as Minority under this clause. However, in the event the City of Chicago identifies any additional groups or individuals as falling under this clause in the future, members of such groups would satisfy the Class A Qualification Criteria.

33.    In the registration statement, Bally's Chicago, Inc. also admits that the racial criteria ("Class A Qualification Criteria") may be illegal and "materially adversely affect our business, financial condition[,] and results of operation." The disclosure reads in full:

**_Only individuals or entities that meet the Class A Qualification Criteria may own Class A Interests, which may lead to lawsuits._**

The Host Community Agreement requires that 25% of Bally's Chicago OpCo's equity be owned by individuals that are women or Minorities or woman- or Minority-owned and controlled entities. As a result, this offering is only being made to individuals and entities that satisfy the Class A Qualification Criteria. This may result in lawsuits against us and the City of Chicago by persons that do not meet the Class A Qualification Criteria who are excluded from this offering. If any person were to bring such a lawsuit against us, we could incur substantial costs defending the lawsuit and the time and attention of our management would be diverted from our business and operations. Furthermore, in the event that a court were to find the Class A Qualification Criteria to be invalid or unconstitutional, the Host Community Agreement could be terminated, which could adversely affect our ability to operate our casinos and could materially adversely affect our business, financial condition and results of operations.

34. Bally's Chicago, Inc. opened its "investor portal" on December 28, 2024, and scheduled the portal to close on January 31, 2025. The IPO's "Investor Timeline" indicates that before January 31, 2025, investors should "sign into" the website to "learn more" and "indicate interest via funding the account." Investors must sign a "subscription agreement" by February 6, 2025, and the closing is planned for February 7, 2025.

35. A screenshot from the website is below:

| Key Actions | Timing |
|---|---|
| Investor Portal Opens | December 28, 2024 |
| Investor Signs into WealthBlock / Bally's Chicago Website to Learn More | December 28, 2024 – January 31, 2025 |
| Investor Opens Custody Account and Indicates Interest via Funding the Account | December 28, 2024 – January 31, 2025 |
| S-1 Effectiveness / Investor Portal Closes | January 31, 2025 |
| Investor Signs Subscription Agreement for Allocation | February 1, 2025 – February 6, 2025 |
| Closing | February 7, 2025 |

36. Interested investors submit an investment commitment online and sign a subscription agreement with Bally Chicago, Inc., which is a contract.[7] The contract has a provision that states, "[t]he undersigned represents and warrants that … [t]he undersigned satisfies the Class A Qualification Criteria."

37. Class A Interests are subject to restrictions on transferability.

---

[7] The subscription agreement is available at this website: https://www.sec.gov/Archives/edgar/data/1935799/000110465924132193/tm231097 1d14_ex1-2.htm.

38.     For example, Class A Interest cannot be transferred without the consent of Bally's Chicago, Inc., and Class A Interests can only be transferred to individuals or entities that have satisfied the Class A Qualification Criteria.

39.     In other words, Class A Interests cannot be transferred to white males.

40.     On or about January 22, 2025, Plaintiffs Fisher and Aronoff became aware of this investment opportunity and that they could not participate. Through their membership in the Alliance, Plaintiffs Fisher and Aronoff learned that it is open only to certain minorities and women. They also reviewed the registration statement and publicly available messages from Bally's Chicago, Inc., which make clear white males cannot invest.

41.     Plaintiffs Fisher and Aronoff meet all necessary non-racial criteria, which consist of the following:

- not be an official, employee, or a family member of an official or employee of the City of Chicago;

- not have been convicted of a felony under the laws of any jurisdiction, including the United States or any state;

- not have been convicted of illegal gambling under any statute in any jurisdiction, including Article 28 of the Illinois Criminal Code of 1961 and Article 28 the Illinois Criminal Code of 2012 or any other similar statutes in any jurisdiction;

- not be a member of the Illinois Gaming Board;

- not have had a license to operate gambling facilities in any jurisdiction revoked or suspended;

- not have knowledge of any facts or circumstances that would be disqualifying under the Illinois Gambling Act;

- not be an individual whose background, reputation and associations would dishonor or harm the reputation of, or result in adverse publicity for, Bally's, Bally's Chicago, Inc., the City of Chicago, the State of Illinois or the gaming industry in Illinois; and

- consent to undergo a background check; and

- have submitted a qualification application to us.

42. On January 28, 2025, Plaintiff Fisher submitted a qualification application. Below are two screenshots. As shown toward the bottom of the first, he was told he is unwelcome because he does not meet the qualification criteria. As the second shows, he did indeed submit a qualification application.



CLASS A QUALIFICATION CRITERIA

For an individual, *'Class A Qualification Criteria'* means an individual that shall:

- be a Minority or a woman;
- not be an official, employee, or a family member of an official or employee of the City of Chicago
- not have been convicted of a felony under the laws of any jurisdiction, including the United States or any state;
- not have been convicted of illegal gambling under any statute in any jurisdiction, including Article 28 of the Illinois Criminal Code of 1961 and Article 28 the Illinois Criminal Code of 2012 or any other similar statutes in any jurisdiction;
- not be a member of the Illinois Gaming Board;
- not have had a license to operate gambling facilities in any jurisdiction revoked or suspended;
- not have knowledge of any facts or circumstances that would be disqualifying under the Illinois Gambling Act;
- not be an individual whose background, reputation and associations would dishonor or harm the reputation of, or result in adverse publicity for, Bally's Corporation, Bally's Chicago, Inc., the City of Chicago, the State of Illinois or the gaming industry in Illinois;
- consent to undergo a background check; and
- have submitted a qualification application to Bally's Chicago, Inc.

I have read the above definition of 'Class A Qualification', pursuant to the Host Community Agreement as agreed with the City of Chicago, and certify that either (check one)

clear selection

○ Yes, I satisfy the criteria

◉ No, I do not satisfy the criteria

This offering is only available to entities who satisfy the **Class A Qualification Criteria** in accordance with the Host Community Agreement with the City of Chicago



43.     Although the final criterion is "have submitted a qualification application to us," Plaintiff Aronoff did not take this step because it would be futile. He is ineligible because of his race. Going through this step would be meaningless—a complete waste of time (like it was for Plaintiff Fisher). Moreover, it would be an affront to his dignity. The final criterion is subject to and premised on racial stereotypes. Through it, a person's race is made a negative.

## CLAIMS

### COUNT ONE: VIOLATION OF 42 U.S.C. § 1981
### (Against All Defendants)

44.     Plaintiffs reallege and incorporate the preceding allegations.

45.     Defendants are impairing Plaintiffs' right to make and enforce contracts, thereby violating 42 U.S.C. § 1981.

46.     Section 1981(a) provides: "All persons within the jurisdiction of the United States shall have the same right in every State … to make and enforce contracts … as is enjoyed by white citizens …."

47.     The United States Supreme Court has held that § 1981 protects all persons—regardless of their race—from "discrimination in the making or enforcement of contracts …." *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 295 (1976).

48.     Section 1981 protects not just racial minorities but white persons too. *Id.* at 286 ("[O]ur examination of the language and history of [§] 1981 convinces us that [it] is applicable to racial discrimination in private employment against white persons."). Stated differently, Section 1981 "guarantee[s] continuous equality between white and nonwhite citizens." *Jam v. Int'l Fin. Corp.*, 586 U.S. 199, 208 (2019) (citing *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 427–30 (1968)).

49.     "Make and enforce contracts" is broadly defined as "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b); *see also McDonald*, 427 U.S. at 295 (explaining § 1981 and its predecessor—the Civil Rights Act of 1866—use "broad terms").

50.     Under this broad definition, a contractual relationship need not pre-exist to trigger liability. *Runyon v. McCrary*, 427 U.S. 160, 172 (1976) ("It is apparent that the racial exclusion practiced by the FairFax-Brewster School and Bobbe's Private School amounts to a classic violation of § 1981. The parents … sought to enter into contractual relationships ….").

51.     Section 1981 protects the "would-be" contractor, not just those "who already have made contracts." *Rajaram v. Meta Platforms, Inc.*, 105 F.4th 1179, 1182 (9th Cir. 2024) (quoting *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006)); *see also Lindsay v. Yates*, 498 F.3d 434, 441 (6th Cir. 2007) (quoting *Domino's Pizza*, 546 U.S. at 476) ("Section 1981 offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship, so long as the plaintiff has or would have rights under the existing or proposed contractual relationship.").

52.     Section 1981(c) clarifies that both government and private actors can be liable for impairing the right to make and enforce contracts. 42 U.S.C. § 1981(c) ("The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law."); *see Runyon*, 427 U.S. at 179 (explaining § 1981 is authorized by Section 2 of the Thirteenth Amendment so it can reach private conduct); *McDonald*, 427 U.S. at 287 (explaining § 1981 reaches discrimination in the context of "private employment").

53.     Persons who suffer discrimination in violation of § 1981 are entitled to "both equitable and legal relief," including "damages." *Fearless Fund*, 103 F.4th at 780 n.8 (quoting *Johnson, Inc. v. Ry. Express Agency, Inc.*, 421 U.S. 454, 460 (1975)) (correcting a district court that mistakenly believed § 1981 does not authorize injunctive relief).

54.     Defendants have impaired Plaintiffs' contractual rights by imposing and enforcing a racial qualification to contract, namely the Class A Qualification Criteria. Plaintiffs seek to make and enforce a contract with Bally's Chicago, Inc. for the purchase of Class A Interests but cannot because of their race.

55.     Defendants are, therefore, liable to Plaintiffs for race discrimination under 42 U.S.C. § 1981. Plaintiffs are entitled to nominal damages, compensatory damages, and punitive damages. *See generally Sommerfield v. Knasiak*, 967 F.3d 617 (7th Cir. 2020) (upholding a jury verdict of $540,000 in punitive damages even though the jury found no compensatory damages).

56.     Punitive damages are especially appropriate because Defendants recklessly disregarded Plaintiffs' rights, as is evidenced by their warning to potential investors that the Class A Qualifications might result in an action like this one. *City of Chicago v. Matchmaker Real Estate Sales Ctr., Inc.*, 982 F.2d 1086, 1099–100 (7th Cir. 1992) ("Defendants argue that they should not be liable for punitive damages because they did not act maliciously …. Good manners … do not insulate individuals from punitive damages. Although these four agents may have been courteous …, their behavior demonstrates that they actively discriminated against the black testers because of their race …. The law does not tolerate this behavior[,] and punitive damages are an appropriate remedy ….").

57. Additionally, Plaintiffs injuries are ongoing because shareholders are not allowed to resell to white males. Plaintiffs would purchase shares on the free market if permitted.

58. Defendants are not only interfering with Plaintiffs' contractual rights but unlawfully restricting the rights of their future shareholders, potentially decreasing the value of shares by artificially limiting demand.

59. Plaintiffs seek specific performance, rescission of the Agreement, and rescission of any shares sold under these illegal and discriminatory criteria.

60. Plaintiffs are entitled to declaratory and injunctive relief. *See generally Bell v. Hood*, 327 U.S. 678, 684 (1946) ("[I]t is … well settled that where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done.").

## COUNT TWO: VIOLATION OF 42 U.S.C. § 1982
### (Against All Defendants)

61. Plaintiffs reallege and incorporate the preceding allegations.

62. Defendants are also violating 42 U.S.C. § 1982.

63. Like § 1981, § 1982 traces its origins to the Civil Rights Act of 1866. It provides: "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982. "While § 1982 does not use the phrase 'discrimination based on race,' that is its plain meaning." *Gomez-*

*Perez v. Potter*, 553 U.S. 474, 479 (2008) (quoting *Tennessee v. Lane*, 541 U.S. 509, 561 (2004) (Scalia, J., dissenting)).

64. The two statutes use similar language to achieve a similar result: colorblindness in a free market economy. In the words of the Seventh Circuit, "there cannot in this country be markets or profits based on the color of a man's skin." *Clark v. Universal Builders, Inc.*, 501 F.2d 324, 332 (7th Cir. 1974) (quoting *Contract Buyers League v. F & F Inv.*, 300 F. Supp. 210, 216 (N.D. Ill. 1969)); *see also id.* at 332 n.7 (quoting *Contract Buyers*, 300 F. Supp. at 215) ("[T]he existence of a black market distinct from a white market was the de facto vestige of what the Congress in 1866 intended to abolish …."). "Price and profit differentials between individual buyers may be justified on a multitude of grounds …. [b]ut … may not turn on whether the prospective buyer has dark or light pigmentation." *Id.* at 332.

65. Simply put, "[r]ace is an impermissible consideration" in a property transaction; moreover, "it need only be established that race played some part in the refusal to deal." *Moore v. Townsend*, 525 F.2d 482, 485 (7th Cir. 1975) (citing *Smith v. Sol D. Adler Realty Co.*, 436 F.2d 344, 349–50 (7th Cir. 1970)).

66. Like § 1981, § 1982 applies to both government and private actors. *Jones*, 392 U.S. 409.

67. Defendants have impaired Plaintiffs' right to purchase, hold, and convey the Class A Interests in Bally's Chicago, Inc. by imposing and enforcing a racial qualification to own said interests, namely the Class A Qualification Criteria. *See generally Lac du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse-Wis., Inc.*, 843 F. Supp. 1284, 1292 (W.D. Wis. 1994) (defining broadly protected property interests under § 1982 to include spearfishing rights), *aff'd*, 41 F.3d 1190 (7th Cir.).

68. Plaintiffs seek to purchase, hold, and convey Class A Interests, which are intangible personal property.

69. Defendants have interfered with Plaintiffs' right to purchase, hold, and convey the Class A Interests, violating Section 1982 by imposing and enforcing a racial qualification to contract, namely the Class A Qualification Criteria.

70. Defendants are, therefore, liable to Plaintiffs for race discrimination under 42 U.S.C. § 1982. Plaintiffs are entitled to nominal damages, compensatory damages, and punitive damages. *See generally Hamilton v. Svatik*, 779 F.2d 383, 389 n.4 (7th Cir. 1985) (citing *Phillips v. Hunter Trails Cmty. Ass'n*, 685 F.2d 184, 191 (7th Cir. 1982)) ("[T]here is no limit on the amount of punitive damages that can be awarded under 42 U.S.C. § 1982.").

71. Additionally, Plaintiffs injuries are ongoing because shareholders are not allowed to resell to white males. Plaintiffs would purchase shares on the free market if permitted.

72. Defendants are not only interfering with Plaintiffs' property rights but unlawfully restricting the rights of their future shareholders, potentially decreasing the value of shares by artificially limiting demand.

73. Plaintiffs also seek specific performance: the sale of shares to them. *See Smith*, 436 F.2d at 350 ("The judgment … is reversed and this cause is remanded … with directions … to order and direct defendants … to tender to plaintiff … a lease on an apartment in the subject apartment building ….").

74. Plaintiffs also seek rescission of the Agreement and rescission of the any shares sold under these illegal and discriminatory criteria.

75. Plaintiffs are entitled to declaratory and injunctive relief.

## COUNT THREE: VIOLATION OF 42 U.S.C. § 1983
### (Against the Governmental Defendants)

76. Plaintiffs reallege and incorporate the preceding allegations.

77. Governmental Defendants have also violated 42 U.S.C. § 1983.

78. The Civil Rights Act of 1871, later codified as 42 U.S.C. § 1983, provides that cities and persons acting under the color of state law "shall be liable to the party injured in an action at law, suit in equity, or other proper proceedings" for the "deprivation of any rights, privileges, or immunities secured by the Constitution."

79.    The United States Constitution's Fourteenth Amendment guarantees the right to "the equal protection of the laws."

80.    Under this guarantee, "any official action that treats a person differently on account of his race or ethnic origin is inherently suspect." *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 310 (2013).

81.    "[R]acial classifications are simply too pernicious to permit any but the most exact connection between justification and classification." *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007) (quoting *Gratz v. Bollinger*, 539 U.S. 244, 270 (2003)); *see also id.* at 752 (Thomas, J., concurring) ("[A]s a general rule, all race-based government decisionmaking—regardless of context—is unconstitutional."). "[Racial] classifications … 'are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality.' … They threaten to stigmatize individuals by reason of their membership in a racial group and to incite racial hostility." *Shaw v. Reno*, 509 U.S. 630, 643 (1993) (quoting *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943)).

82.    When confronted with such a racial classification, "[a]ny person, of whatever race, has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest judicial scrutiny." *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 224 (1995).

83. "Under strict scrutiny, the government has the burden of proving that racial classifications 'are narrowly tailored measures that further compelling governmental interests.'" *Johnson v. California*, 543 U.S. 499, 505 (2005) (quoting *Adarand*, 515 U.S. at 227).

84. Additionally, even if strict scrutiny is satisfied, a racial classification must pass two additional hurdles: twin commands and logical endpoint. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 213 (2023). *See generally* Daniel P. Lennington & Skylar Croy, *The Twin Commands: Streamlining Equality Litigation Based on* Students for Fair Admissions, 25 Federalist Soc'y Rev. 349 (2024).

85. Pursuant to the twin commands, "race may never be used as a 'negative' and[,] ... it may not operate as a stereotype." *Students for Fair Admissions*, 600 U.S. at 218. In a "zero-sum" situation, like college admissions, any use of race is necessarily negative and based on stereotypes. *Id.* at 218–19.

86. Additionally, any use of race must have a "logical end point." *Id.* at 222 (quoting *Grutter v. Bollinger*, 539 U.S. 306, 346 (2003)). Logical end point presupposes a date certain, not mere "frequent review" by decisionmakers regarding the (purported) continued necessity of a racial classification. *Id.* at 225.

87. The City imposed a racial classification upon Plaintiffs by entering into and enforcing the Agreement and the Municipal Code of Chicago 2-92-670(n).

88. Illinois Gaming Board imposed a racial classification upon Plaintiffs by enforcing 230 ILCS 10/6(a-5)(9).

89. The Agreement, municipal code, and statute fail strict scrutiny because the racial classification does not further a compelling interest and, in any event, is not narrowly tailored.

90. Moreover, they do not comply with the twin commands and lack a logical end point (indeed, the shares cannot even be resold to white males—not in five years and not in twenty years).

91. Plaintiffs were harmed by the Government Defendants' enforcement and implementation of the Agreement, the municipal code, and statute, which collectively and individually imposed an unconstitutional racial classification upon Plaintiffs and prevented them from purchasing Class A Interests.

92. Defendants are, therefore, liable to Plaintiffs for race discrimination under 42 U.S.C. § 1983. Plaintiffs are entitled to nominal damages, compensatory damages, and punitive damages.

93. Additionally, Plaintiffs injuries are ongoing because shareholders are not allowed to resell to white males. Plaintiffs would purchase shares on the free market if permitted.

94. Defendants are not only interfering with Plaintiffs' equal protection rights but unlawfully restricting the rights of their future shareholders, potentially decreasing the value of shares by artificially limiting demand.

95. Plaintiffs also seek specific performance, rescission of the Agreement, and rescission of any shares sold under these illegal and discriminatory criteria.

96. Plaintiffs are entitled to declaratory and injunctive relief. In particular, 230 ILCS 10/6(a-5)(9) should be declared unconstitutional (as applied and on its face). The Illinois Gaming Board Members should be enjoined from ever again enforcing 230 ILCS 10/6(a-5)(9).

### CLAIM FIVE: VIOLATION OF THE FIRST KU KLUX KLAN ACT
### 42 U.S.C. § 1985
### (Against City of Chicago, Bally's Chicago, and Bally's Chicago OpCo)

97. Plaintiffs reallege and incorporate the preceding allegations.

98. In 1870, Congress passed the First Ku Klux Klan Act to outlaw conspiracies to deprive civil rights. Now codified at 42 U.S.C. § 1985, § 1985 provides that "[i]f two or more persons in any State or Territory conspire … for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws, … the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators." By its plain language, it reaches both government and private actors, just like §§ 1981 and 1982. *Griffin v. Breckenridge*, 403 U.S. 88, 101 (1971).

99. Defendants City of Chicago, Bally's Chicago, Inc., and Bally's Chicago OpCo, through their officers and employees, conspired to violate Plaintiffs' civil rights by agreeing to prevent white males from owning Class A Interests. At a minimum, the officers and employees involved include then-Mayor Lightfoot, City Clerk Valencia, Bally's Chicago OpCo President Papanier, and Bally's Chicago, Inc.

President Patel. These officers and employees acted within the scope of their official duties and employment.

100.   These Defendants actions included: (1) "some racial, or perhaps otherwise class-based, invidiously discriminatory animus," *Griffin*, 403 U.S. at 102, and (2) a conspiracy "aimed at interfering with rights" that are "protected against private, as well as official, encroachment," *Carpenters v. Scott*, 463 U.S. 825, 833 (1983).

101.   In fact, Defendants knew their actions were illegal, as evidenced by the registration statement, which warned investors of possible legal action.

102.   Plaintiffs were injured when Defendants overtly acted on their conspiracy through the initial public offering.

103.   Defendants are, therefore, liable to Plaintiffs for a conspiracy to violate civil rights under 42 U.S.C. § 1985. Plaintiffs are entitled to nominal damages, compensatory damages, and punitive damages.

104.   Additionally, Plaintiffs injuries are ongoing because shareholders are not allowed to resell to white males. Plaintiffs would purchase shares on the free market if permitted.

105.   Defendants are not only interfering with Plaintiffs' civil rights but unlawfully restricting the rights of their future shareholders, potentially decreasing the value of shares by artificially limiting demand.

106.     Plaintiffs seek specific performance, rescission of the Agreement, and rescission of any shares sold under these illegal and discriminatory criteria.

107.     Plaintiffs are entitled to declaratory and injunctive relief.

## REQUEST FOR RELIEF

Plaintiffs, therefore, request the following relief:

A.     A declaratory judgment that Defendants violated Plaintiffs' rights under 42 U.S.C. §§ 1981, 1982, 1983, and 1985;

B.     A declaratory judgment that the Agreement's racial classifications are illegal under federal law;

C.     A declaratory judgment that the Class A Qualification Criteria, and any shares issued under those criteria, are illegal under federal law;

D.     A declaratory judgment that the municipal code's definition of "minority" and 230 ILCS 10/6(a-5)(9) violate the Fourteenth Amendment;

E.     A permanent injunction preventing the Illinois Gaming Board Members from enforcing 230 ILCS 10/6(a-5)(9);

F.     A permanent injunction permitting shareholders to sell their Class A Interests to white males;

G.     A permanent injunction requiring rescission of the Agreement;

H.     A permanent injunction requiring recission of shares sold under the Class A Qualification Criteria;

I.       An order requiring Bally's Chicago, Inc. to sell Class A Interests to Alliance members, including Plaintiffs Fisher and Aronoff, on the same terms that they are about to be sold to minorities and women (minus the racially discriminatory terms);

J.       An award of nominal, compensatory, and punitive damages as determined at trial;

K.       An award of reasonable costs and expenses of this action, including attorney fees, under 42 U.S.C. § 1988 and any other applicable laws; and

L.       Any such other relief as this Court deems appropriate.

Dated: January 29, 2025

Respectfully Submitted,

WISCONSIN INSTITUTE FOR
LAW & LIBERTY

*Electronically signed by*
*Daniel P. Lennington*
Daniel P. Lennington
Skylar Croy

330 E. Kilbourn Ave., Suite 725
Milwaukee, WI 53202
Phone: (414) 727-9455
Fax: (414) 727-6385

Dan@will-law.org
Skylar@will-law.org

*Attorneys for Plaintiffs*